UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA          :

                                  :

                                  :

            -v-                   :

                                  :

                                  :

BERNARD B. KERIK,                 :

                                  :

            Defendant.            :

------------------------------------x

**ORIGINAL**

U.S. DISTRICT COURT
FILED
DEC 2 - 2008
S.D. OF N.Y.
W.P.

INDICTMENT

S1 07 Cr. 1027 (SCR)

## COUNT ONE

### (Conspiracy To Deprive The City Of New York And Its Citizens Of Honest Services)

The Grand Jury charges:

1.  On or about January 5, 1998, BERNARD B. KERIK, the defendant, was appointed Commissioner of the New York City Department of Corrections ("NYCDOC").  As the Commissioner of the NYCDOC, KERIK oversaw and managed all New York City institutions established for the care and custody of felons, misdemeanants, prisoners under arrest and awaiting arraignment, violators of local laws and ordinances, and, in some instances, witnesses.

2.  On or about August 20, 2000, KERIK, the defendant, left his post as the Commissioner of the NYCDOC and, pursuant to appointment by the Mayor, became the Commissioner of the New York City Police Department ("NYCPD"), where he remained, until he resigned on or about January 1, 2002.  As the New York City's chief law enforcement officer, KERIK had a duty to prevent crime,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

detect and arrest offenders, and enforce and prevent the violation of all laws and ordinances in force in the City.

3.   At all times relevant to this Indictment:

(a)   "John Doe #1" and "John Doe #2," unindicted coconspirators, were the principals of a number of related companies engaged in the construction and waste management industries ("XYZ").  XYZ, a New Jersey based company, was engaged in work for private, municipal and state clients in both New York and New Jersey and sought to be selected for additional public sector projects.

(b)   "John Doe #3" was an employee of XYZ.

(c)   The New York City Charter (the "Charter") provided that:  "No public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain, contract, license, privilege or other private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant."

(d)   The Charter further provided that:  "No public servant shall accept any valuable gift, as defined by rule of the [New York City Conflicts of Interest Board ("NYCCOIB")] from any person or firm which such public servant knows is or intends to become engaged in business dealings with the city....."

(e)   The Rules of the NYCCOIB prohibited, among other things, a public servant's receipt of any valuable gift which

2

would "result in ...  using his or her office for private gain..."

 (f)  The Charter further provided that "[a]ny person who violates [the aforementioned provisions of The Charter] shall be guilty of a [crime] and, upon conviction thereof shall forfeit his or her public office or employment."

 (g)  The Administrative Code of the City of New York ("The Code") required that certain persons, including the heads of all City agencies, file annual financial disclosure reports.

 (h)  The Code further required that financial disclosure report filers disclose in their reports, among other things, "the nature and amount of any income of one thousand dollars or more from each source derived during the previous calendar year;" any "gift, its value and nature, in the aggregate amount or value of one thousand dollars or more from any single source;" and any "outstanding loan in the amount of $1,000 or more."

 (i)  The Code further provided that "any intentional violation of the [aforementioned requirements of The Code], including but not limited to ... failure to include ... liabilities, and misstatement of ... liabilities [on a financial disclosure report], shall constitute a [crime] and shall constitute grounds for disciplinary penalties, including removal from office."

3

(j)  At all times relevant to this Indictment, New York City and its citizens had an intangible right to the honest services of their public officials.  As a public official for the City, the defendant KERIK had a duty to: (i) perform his official duties honestly and refrain from influence peddling; (ii) refrain from receiving corrupt and illegal payments designed to affect the performance of official duties or coax favorable official action; (iii) refrain from accepting valuable gifts from those conducting business with or seeking to conduct business with the City; (iv) disclose conflicts of interest and other material information in matters that resulted in his direct or indirect personal gain; and (v) provide complete and accurate information on his financial disclosure filings.

### Conspiracy

4.  From in or about late 1998, through 2006, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, John Doe #1 and John Doe #2, unindicted coconspirators, together with others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.

4

## Objects Of The Conspiracy

5.   It was a part and an object of the conspiracy that
KERIK, and unindicted coconspirators John Doe #1 and John Doe #2,
together with others known and unknown, unlawfully, willfully and
knowingly devised and intended to devise a scheme and artifice to
defraud, and to deprive the City of New York and its citizens of
their intangible right to the honest services of KERIK, and for
the purpose of executing such scheme and artifice and attempting
so to do would and did (1) transmit and cause to be transmitted
by means of wire and radio communications in interstate and
foreign commerce, writings, signs, signals, pictures, and sounds,
to wit, interstate telephone calls, faxes and e-mails, in
violation of Title 18, United States Code, Sections 1343 and 1346
and (2) cause matters and things to be delivered by mail and
private interstate carrier according to the directions thereon,
to wit, correspondence, invoices, prequalification forms and
bidding documents, in violation of Title 18, United States Code,
Sections 1341 and 1346.

6.   It was further a part and an object of the conspiracy
that XYZ, John Doe #1, John Doe #2, and others known and unknown
would and did give money and other things of value to KERIK, and
that KERIK, while concealing material information -- namely,
XYZ's, John Doe #1's, and John Doe #2's provision and KERIK'S
receipt of these material benefits -- agreed to assist and

5

endeavored to assist XYZ through the use of his public office, by, among other things, contacting on XYZ's behalf regulators and other public officials who were considering whether XYZ should be licensed to do business in New York City and should be awarded municipal-regulated business, including, but not limited to, a permit from the New York City Department of Sanitation ("NYCDOS") to operate a material fill transfer station on Staten Island.

7.   It was further a part and an object of the conspiracy that XYZ would obtain licenses, permits, clearances, and approvals to do business with one or more New York City agencies or within an industry regulated by the City, including, but not limited to, the NYCDOS material fill transfer station permit above.

### Means And Methods Of The Conspiracy

8.   Among the means and methods used by KERIK, John Doe #1 and John Doe #2, and their co-conspirators to achieve the unlawful object of the conspiracy were the following:

### Corrupt Acceptance Of Payments

9.   XYZ was under investigation by several government agencies including the New York City Department of Investigation ("NYCDOI"), the New York City Trade Waste Commission ("NYCTWC," later renamed the Business Integrity Commission ("BIC")), and the New Jersey Division of Gaming Enforcement ("NJDOGE").  These agencies sought to determine, among other things, whether the

company had ties to organized crime and whether XYZ, its principals and key employees possessed the requisite integrity to perform publicly funded or regulated contracts.

10. In or about late 1998, XYZ enlisted the influence and assistance of KERIK in its efforts to convince regulators that the company had rid itself of organized crime ties and otherwise possessed the requisite integrity to perform publicly funded or regulated contracts.

11. In or about April and May 1999, KERIK advised John Doe #3 that he was purchasing a cooperative apartment in Riverdale, New York (the "Riverdale Apartment" or "the apartment"), which he planned to renovate and implicitly requested monies from John Doe #3 for such purposes.

12. After KERIK purchased the Riverdale Apartment, XYZ arranged and paid for an architect and an interior designer to redesign and renovate the apartment. The design and renovation of the apartment included demolishing old walls, and constructing new walls and floors, a new kitchen, new marble bathrooms with a jacuzzi, and a marble entrance rotunda.

13. After the design was complete, XYZ hired a general contractor to renovate the Riverdale Apartment. On or about November 17, 1999, and February 25, April 13, April 24, May 8, June 21, October 20, and December 5, 2000, XYZ made payments to the general contractor who renovated the apartment as payment for

the substantial renovations completed on the apartment.  XYZ paid a total of more than $255,000 to contractors and subcontractors who renovated the apartment.

14.  During the period that KERIK requested and received these benefits from XYZ, he assisted the company by contacting and speaking with regulators and other public officials on XYZ's behalf so that XYZ would be permitted to do municipal-regulated business.

15.  In or about late 1998 through early 1999, KERIK, at a meeting in his NYCDOC office, introduced John Doe #3 to "John Doe #4," a private security consultant, as someone who XYZ should hire to provide security and other services.

16.  In or about mid to late July 1999, KERIK attended a meeting at a Manhattan restaurant with an official of the NYCTWC and an official of the NYCDOI, at which the XYZ investigation was discussed.  During the meeting, KERIK questioned the first official's concern that XYZ had organized crime ties, vouched for John Doe #3 and John Doe #4, and offered to provide John Doe #3's assistance in the NYCTWC's investigation.

17.  Shortly after attending this meeting, on or about July 24, 1999, KERIK sent John Doe #3 an email explaining that "I put my reputation and integrity on the line defending whatever [John Doe #3] asked **_without question._**" (Emphasis in original).  Later, in that same email, KERIK complained that he felt like he was on

"welfare" as compared to the life-style John Doe #3 lived.  He explained as follows:  "I'm walking on eggshells until this apartment is done.  A bullshit $170,000., [sic] I had to beg, borrow and [expletive] for the down payment and I'm still [expletive] over the $5,000. [sic] I need for closing if it happens.  Then the renovations."

18.  In or about August or September of 1999, KERIK facilitated a meeting between John Doe #3 and NYCTWC Investigators in his NYCDOC office and allowed his official offices to be used by them to discuss the ongoing investigation of XYZ.

19.  In or about 1999, KERIK telephoned the Assistant Commissioner for the NYCDOI who was working in conjunction with the NYCTWC on the XYZ Investigation, and attempted to vouch for John Doe #1, John Doe #2, and XYZ.

### Concealment Of The Corrupt Agreement

20.  Because (1) XYZ was being investigated by a number of regulatory agencies who were seeking to determine whether the company had the requisite integrity to perform public contracts, and (2) KERIK was a high level public official at the time the corrupt payments were made, it was a necessary part of the agreement to conceal the illegal payments from New York City officials and regulators while XYZ was seeking a determination that the company and its principals possessed the requisite

integrity to engage in contracts with public entities and perform
municipal work.  Those efforts continued until at least through
in or about 2005 when, based on a report issued by the BIC
(formerly, the NYCTWC), the NYCDOS denied XYZ's application for
the permit to operate a material fill transfer station on Staten
Island.  KERIK and unindicted coconspirators John Doe #1 and John
Doe #2 took the following steps, among others, to conceal the
corrupt agreement:

> (a)   John Doe #1 and John Doe #2 concealed
> the payments made by XYZ to contractors
> working on KERIK'S apartment in the books and
> records of XYZ by, among other things,
> allocating the costs of the renovations to
> other XYZ jobs and overhead accounts and by
> "bartering," i.e., exchanging services XYZ
> provided to contractors for services the
> contractors provided in connection with the
> renovation of the Riverdale Apartment;
>
> (b)   KERIK deliberately omitted the payments
> made by XYZ on his behalf from financial
> disclosure forms he submitted to the NYCDOI
> and the NYCCOIB;
>
> (c)   KERIK concealed the payments by failing
> to report them as income on tax returns filed
> with the federal government;
>
> (d)   John Doe #1 and John Doe #2 concealed
> the payments by deducting them as business
> expenses on the XYZ tax return filed with the
> federal government;
>
> (e)   John Doe #1 and John Doe #2 made false
> statements on prequalification and background
> forms submitted to New York City agencies
> relating to the payments made by XYZ on
> KERIK'S behalf;

(f)   KERIK, John Doe #1, and John Doe #2 made
false statements about, and otherwise failed
to disclose, the corrupt payments to federal,
state and local government agencies and
officials, a state grand jury, the media and
the public;

(g)   KERIK attempted to cause and caused
witnesses to make false statements to the
NYCDOI and other local law enforcement
officials investigating his receipt of
corrupt payments, and otherwise attempted to
obstruct a state grand jury investigation
into his receipt of said payments.

(Title 18, United States Code, Section 1349)

11

## COUNT TWO

### (Mail Fraud - Theft Of Honest Services)

The Grand Jury further charges:

21.  The allegations contained in paragraphs one through twenty of this Indictment are repeated and re-alleged as though fully set forth herein.

22.  From in or about late 1998 through and including 2006, in the Southern District of New York and elsewhere, KERIK, the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the City of New York and its citizens of their intangible right to the honest services of KERIK, and, for the purpose of executing such scheme and artifice and attempting so to do, caused matters and things to be delivered by mail according to the directions thereon, to wit, correspondence, invoices, prequalification and background forms, and bidding documents.

(Title 18, United States Code, Sections 1341, 1346 and 2)

12

## COUNT THREE

### (Wire Fraud - Theft Of Honest Services)

The Grand Jury further charges:

23.   The allegations contained in paragraphs one through twenty of this Indictment are repeated and re-alleged as though fully set forth herein.

24.   From in or about late 1998 through and including 2006, in the Southern District of New York and elsewhere, KERIK, the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the City of New York and its citizens of their intangible right to the honest services of KERIK, and, for the purpose of executing such scheme and artifice and attempting so to do, transmitted and caused to be transmitted by means of wire and radio communications in interstate and foreign commerce signs, signals, pictures and sounds, to wit, correspondence, invoices, prequalification forms, and bidding documents, sent by fax and e-mail.

(Title 18, United States Code, Sections 1343, 1346 and 2)

## COUNT FOUR

**(Obstructing Or Impeding The Administration Of The IRS)**

The Grand Jury further charges:

25.    The allegations in paragraphs one through twenty of this Indictment are repeated and re-alleged as though fully set forth herein.

26.    In or about January 2002, BERNARD B. KERIK, the defendant, caused the formation of Gryphon Strategic Group, LLC, a Delaware limited liability company ("Gryphon"), wholly owned by KERIK.  KERIK used Gryphon to receive income KERIK earned for speaking engagements, book royalties, and other miscellaneous sources.  Gryphon maintained bank accounts controlled by KERIK. KERIK was required to report accurately Gryphon's income and expenses on an Internal Revenue Service ("IRS") Form Schedule C ("Profit or Loss from Business") attached to his U.S. Individual Income Tax Return IRS Form 1040.

### Statutory Allegations

27.    Beginning in or about 1999, and continuing thereafter up to and including the date of filing this Indictment, in the Southern District of New York and elsewhere, the defendant, BERNARD B. KERIK, did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the Internal Revenue laws.

14

### Means And Methods

28. Among the means and methods by which KERIK corruptly obstructed and impeded, and attempted to obstruct and impede, the due administration of the Internal Revenue laws, were the following: during a nine year period, from 1999 to date, KERIK (1) provided false information and failed to disclose information to his accountants; (2) failed to disclose to his accountants and return preparers substantial income he had received personally and through Gryphon; (3) subscribed to and caused to be filed false U.S. Individual Income Tax Returns, IRS Forms 1040; (4) failed to report in excess of $500,000 in income; (5) took false and fraudulent deductions against his income on his tax returns; (6) failed to report to the IRS wages he paid to a household employee and failed to remit Social Security and other tax payments to the IRS; and (7) structured his financial transactions to avoid generating documentation which would have alerted the IRS to the falsity of tax returns that he did file.

29. Among the items of income KERIK failed timely to report are the following:

> (a)   KERIK failed to report as income approximately $255,000 in illegal payments made for his benefit in 1999 and 2000 when John Doe #1, John Doe #2, and XYZ paid for the renovations to the Riverdale Apartment as described in Count One.

> (b)   In or about October 2001, while KERIK was the Police Commissioner of the City of New York, he approached a New York City real

estate developer whom he anticipated doing business with in the future ("John Doe #5") and requested his assistance in locating an apartment situated on the Upper East Side of Manhattan.  In anticipation of their future business relationship, John Doe #5 located a luxury apartment for KERIK and made monthly rental payments on KERIK'S behalf from December 2001 through December 2003.  The monthly payments in the approximate amount of $9,650 totaled $236,269.36 over the above-stated period.  Despite his receipt of this substantial income, KERIK failed to disclose such income to his tax return preparers and failed to report such income on his 2001, 2002, and 2003 U.S. Individual Income Tax Returns.

(c)  In or about February 2002, KERIK, through Gryphon, entered into an agreement with a computer software company to provide consulting services in exchange for a monthly consulting fee of $10,000 and a percentage of the company.  In or about April 2002, the company paid KERIK approximately $20,000.  Kerik failed to disclose the contract and income he received from the company to his return preparer and failed to report such income on his 2002 U.S. Individual Income Tax Return.

(d)  In or about January 2002, KERIK signed a contract with a book publisher to write a forward for a book.  The publisher paid KERIK a total of approximately $75,953 in fees and royalties over a three year period from 2002 to 2004 in exchange for these services.  KERIK failed to disclose to his return preparers the fees and royalties he earned from the book and failed to report such income on his 2002, 2003 and 2004 U.S. Individual Income Tax Returns.

(e)  In or about late 2003, KERIK entered into an agreement with a company that produced armored cars in which KERIK would receive commissions for facilitating the sale of such vehicles.  The agreement, which was

later reduced to writing, provided that in addition to the commissions the armored car company would provide KERIK with the use of a new luxury sedan manufactured by the armored car company as compensation for his services. KERIK failed to report the value of the use of the car on his 2005 U.S. Individual Joint income tax return.

30.   Among the false deductions KERIK claimed on his U.S. Individual Income Tax Returns are the following:

(a)   In early 2003, KERIK falsely advised his accountant that he made $80,000 in charitable contributions.  Based on this false information, KERIK'S accountant prepared a false U.S. Individual Income Tax Return deducting those contributions, which KERIK signed and caused to be filed with the IRS.

(b)   In or about early 2004, KERIK signed and caused to be filed a 2003 New Jersey Resident Income Tax Return which falsely claimed that he resided in New Jersey during the 2003 tax year when he actually lived on the Upper East Side of Manhattan in an apartment paid for by John Doe #5.  At or about the same time, KERIK caused to be filed a U.S. Individual Income Tax Return for the tax year 2003 which deducted as a business expense a home office that he claimed to have maintained in the state of New Jersey when in fact he did not even live in the state during the 2003 tax year.

31.   During the 2002 and 2003 tax years, KERIK employed a regular domestic employee, who served as a nanny for his children.  As such an employer, KERIK was required to report to the IRS the wages he paid to his employee, and was also required to remit to the IRS certain amounts for, among other things, Social Security and Medicare taxes.  KERIK failed to report to

17

the IRS the wages he paid to this employee and failed to remit to

the IRS any payroll taxes due and owing for the said employee.

     (Title 26, United States Code, Section 7212(a))

## COUNTS FIVE THROUGH SEVEN

**(Aiding And Assisting In The Preparation Of False And Fraudulent Tax Returns)**

The Grand Jury further charges:

32.   The allegations contained in paragraphs one through thirty-one of this Indictment are hereby repeated and re-alleged as though fully set forth herein.

33.   On or about the dates specified below, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, unlawfully, willfully and knowingly did aid and assist in, and procure, counsel, and advise the preparation and presentation under, the internal revenue laws, of false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for himself and his wife as follows:

19

| COUNT | TAX YEAR | RETURN FILING DATE | FALSE ITEMS(S) |
|-------|----------|--------------------|----------------|
| 5 | 2000 | 4/15/01 | Failure to declare as income the illegal payments made for his benefit when John Doe #1, John Doe #2, and XYZ paid for the renovations to the Riverdale Apartment as described in Count One. |
| 6 | 2002 | 4/15/03 | Failure to declare income from:  John Doe #5, a computer software company, and a book publisher

False charitable deduction

Failure to report wages paid to a regular domestic employee |
| 7 | 2005 | 5/15/06 | Failure to declare value of the use of a luxury sedan provided as compensation for consulting services |

(Title 26, United States Code, Section 7206(2))

20

## COUNTS EIGHT AND NINE

### (Subscribing To False Tax Returns)

The Grand Jury further charges:

34.   The allegations contained in paragraphs one through thirty-one of this Indictment are hereby repeated and re-alleged as though fully set forth herein.

35.   On or about the dates set forth below, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, unlawfully, willfully and knowingly did make and subscribe U.S. Individual Income Tax Returns, Forms 1040, for himself and his wife for the tax years set forth below, which returns contained and were verified by the written declaration of KERIK that they were made under penalties of perjury, and which returns KERIK did not believe to be true and correct as to every material matter:

| COUNT | TAX YEAR | RETURN FILING DATE | FALSE ITEMS |
|---|---|---|---|
| 8 | 2002 | 4/15/03 | Failure to declare income from: John Doe #5, a computer software company, and a book publisher<br><br>False charitable deduction<br><br>Failure to report wages paid to a regular domestic employee |
| 9 | 2003 | 4/15/04 | False deduction of home office expense<br><br>Failure to report wages paid to a regular domestic employee |

(Title 26, United States Code, Section 7206(1) and
Title 18, United States Code, Section 2)

## COUNT TEN

**(False Statements In Connection With A Loan Application)**

The Grand Jury further charges:

36.   The allegations contained in paragraphs eleven and seventeen of this Indictment are repeated and re-alleged as though fully set forth herein.

37.   At all times relevant to this Indictment, the National Community Bank ("NCB") was a bank the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

38.   From on or about April 20, 1999 through on or about May 4, 2000, "John Doe #6," a Manhattan realtor who conducted businesses requiring various approvals from New York City, made a personal loan of a total of $28,000 to KERIK ("the John Doe #6 loan").   The John Doe #6 loan was comprised of a series of checks including checks for $8,000 and $9,000.   The John Doe #6 loan was repaid on or about October 28, 2003.

39.   In or about September 1999, KERIK, the defendant, applied for a home mortgage loan from NCB in order to purchase the Riverdale Apartment.

40.   In or about September 1999, in the Southern District of New York, BERNARD B. KERIK, the defendant, unlawfully, willfully and knowingly did make false statements and reports for the purpose of influencing in any way the action of an institution, the accounts of which were insured by the FDIC, upon an

23

application, purchase, purchase agreement and loan, to wit, in applying for the mortgage loan from NCB above, KERIK made the following false statements:  a) through a mortgage broker, KERIK falsely represented to the bank that the $8,000 and $9,000 checks above, which had been deposited to his bank account, were wedding gifts; b) through a mortgage broker, KERIK falsely represented to the bank that the receipt of the $8,000 and $9,000 checks above had been "documented and provided to the [NYCCOIB] and the [NYCDOI] Financial Disclosure Report [sic] as required by law and the New York City Charter"; c) KERIK signed and caused to be submitted to the bank a uniform residential loan application, wherein he failed to disclose as a liability as required the John Doe #6 loan; d) KERIK signed and caused to be submitted to the bank a uniform residential loan application wherein he falsely stated that no part of the downpayment for the purchase of the Riverdale Apartment had been borrowed.

(Title 18, United States Code, Section 1014)

## COUNT ELEVEN

### (False Statements To The Federal Government)

The Grand Jury further charges:

41.  The allegations contained in paragraphs one through twenty and thirty-one of this Indictment are repeated and re-alleged as though fully set forth herein.

42.  From between late 2002 through late 2003, BERNARD B. KERIK, the defendant, sought membership on the Academe & Policy Research Senior Advisory Committee to The White House Office of Homeland Security.  This position involved vital national security interests, and KERIK, during background inquiries in connection with his application, was required to answer oral and written questions about his background.

43.  On or about the dates set forth below, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, in matters within the jurisdiction of the executive branch of the Government of the United States, unlawfully, willfully and knowingly did falsify, conceal and cover up by trick, scheme and device a material fact, and did make, materially false, fictitious and fraudulent statements and representations, namely, the following (where direct quotes, the statements and representations are underscored):

| APPROXIMATE DATE | DOCUMENT OR OFFICIAL AT ISSUE | FALSE STATEMENT |
|---|---|---|
| 10/29/2002 | White House Official A | When asked whether he had any household employees for whom he did not withhold appropriate federal and state taxes, KERIK stated: "<u>No</u>." |
| 12/19/2002 | Response to Personal Data Statement Questionnaire from the Office of Counsel to the President | In response to a direction that he list any household employees, including nannies, that he employed to perform services on a regular basis in the last ten years, KERIK stated: "<u>No household employees on a regular basis</u>." |

(Title 18, United States Code, Section 1001)

## COUNT TWELVE

### (False Statements To The Federal Government)

The Grand Jury further charges:

44. The allegations contained in paragraphs one through twenty, thirty-one, thirty-seven through forty, and forty-two of this Indictment are repeated and re-alleged as though fully set forth herein.

45. On or about the dates set forth below, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, in matters within the jurisdiction of the executive branch of the Government of the United States and in connection with seeking membership on the Academe & Policy Research Senior Advisory Committee to The White House Office of Homeland Security described in paragraph forty-two above, unlawfully, willfully and knowingly did falsify, conceal and cover up by trick, scheme and device a material fact, and did make, materially false, fictitious and fraudulent statements and representations, namely, the following (where direct quotes, the statements and representations are underscored):

| APPROXIMATE DATE | DOCUMENT OR OFFICIAL AT ISSUE | FALSE STATEMENT |
| --- | --- | --- |
| 10/29/2002 | White House Official A | When asked whether there was anything embarrassing that he wouldn't want the public to know about, KERIK stated, in pertinent part, "Nope! It's all in my book." |

| 12/19/2002 | Response to Personal Data Statement Questionnaire from the Office of Counsel to the President | When asked whether he or his spouse ever had any association with any person, group or business venture that could be used, even unfairly, to impugn or attack his character and qualifications for a government position, KERIK stated:  "<u>No questionable business affiliations</u>." |
| --- | --- | --- |
| 12/19/2002 | Response to Personal Data Statement Questionnaire from the Office of Counsel to the President | When asked whether there was any other information, including information about other members of his family, that could be considered a possible source of embarrassment to him, his family, or the President, KERIK stated: "<u>Not to my knowledge</u>." |

(Title 18, United States Code, Section 1001)

28

## COUNT THIRTEEN

### (False Statements To The Federal Government)

The Grand Jury further charges:

46.  On or about June 13, 2003, "John Doe #7," a Brooklyn businessman, made a personal loan of $250,000 to KERIK ("the John Doe #7 loan").  As KERIK well knew, John Doe #7 obtained the funds with which to make the loan to KERIK by in turn taking a loan from "John Doe #8," a wealthy Israeli industrialist whose companies did business with the federal government.  The John Doe #7 loan was repaid on June 10, 2005.

47.  From on or about October 28, 2003, through on or about November 24, 2003, BERNARD B. KERIK, the defendant, sought membership on the Academe & Policy Research Senior Advisory Committee of the Homeland Security Advisory Council (part of the United States Department of Homeland Security and successor to the Academe & Policy Research Senior Advisory Committee to The White House Office of Homeland Security described in paragraph forty-two above).

48.  Between and including on or about the dates set forth below, in the Southern District of New York and elsewhere, BERNARD B. KERIK, the defendant, in matters within the jurisdiction of the executive branch of the Government of the United States, unlawfully, willfully and knowingly did falsify, conceal and cover up by trick, scheme and device a material fact,

29

and did make, materially false, fictitious and fraudulent statements and representations, namely, the following:

| APPROXIMATE DATES | DOCUMENT AT ISSUE | FALSE STATEMENT |
|---|---|---|
| 10/28/2003– 11/24/2003 | OGE Form 450 (Executive Branch Confidential Financial Disclosure Report) | When directed to report liabilities over $10,000, KERIK checked a box indicating "None." |

(Title 18, United States Code, Section 1001)

## COUNT FOURTEEN

### (False Statements To The Federal Government)

The Grand Jury further charges:

49.   The allegations contained in paragraphs one through twenty of this Indictment are repeated and re-alleged as though fully set forth herein.

50.   From in or about November 2004 through on or about December 11, 2004, Kerik was being considered for the position of Secretary of the United States Department of Homeland Security. This position involved vital national security interests, and KERIK, during inquiries in connection with his prospective appointment, was required to answer questions concerning his background.

51.   On or about the dates set forth below, in the District of Columbia and elsewhere, BERNARD B. KERIK, the defendant, in matters within the jurisdiction of the executive branch of the Government of the United States, unlawfully, willfully and knowingly did falsify, conceal and cover up by trick, scheme and device a material fact, and did make, materially false, fictitious and fraudulent statements and representations, namely, the following:

| APPROXIMATE DATES | OFFICIAL AT ISSUE | FALSE STATEMENT |
|---|---|---|
| 11/17/2004–12/3/2004 | White House Official C | When asked whether there was any possible concern the President should have about KERIK's relationship with John Doe #3 or XYZ, KERIK stated that there were none. |
| 11/17/2004–12/3/2004 | White House Official C | When asked whether, if, as a public official in New York City, KERIK had any financial dealings with individuals seeking to do business with the City, KERIK denied that he had had any such dealings. |

(Title 18, United States Code, Section 1001)

## COUNT FIFTEEN

### (False Statements To The Federal Government)

The Grand Jury further charges:

52.  The allegations contained in paragraphs one through twenty and fifty this Indictment are repeated and re-alleged as though fully set forth herein.

53.  On or about the date set forth below, in the District of Columbia and elsewhere, BERNARD B. KERIK, the defendant, in matters within the jurisdiction of the executive branch of the Government of the United States and in connection with his vetting for the position of Secretary of the United States Department of Homeland Security as described in paragraph fifty above, unlawfully, willfully and knowingly did falsify, conceal and cover up by trick, scheme and device a material fact, and did make, materially false, fictitious and fraudulent statements and representations, including, among others, the following:

| APPROXIMATE DATE | DOCUMENT AT ISSUE | FALSE STATEMENT |
|---|---|---|
| 12/5/2004 | email to White House Official B | When asked by a White House Official for a complete account of KERIK's relationship with John Doe #3, KERIK gave a false and misleading account concerning the renovations to the Riverdale Apartment, including the total cost of the renovations and who paid for them. |

(Title 18, United States Code, Section 1001)

33

## FORFEITURE ALLEGATION

54.  As the result of committing the conspiracy, mail fraud
and wire fraud offenses in violation of Title 18, United States
Code, Sections 1341, 1343, 1346 and 1349, alleged in Counts One
through Three of this Indictment, BERNARD B. KERIK, the
defendant, shall forfeit to the United States, pursuant to 18
U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461, all property, real
and personal, that constitutes or is derived from proceeds
traceable to the commission of the offense, including but not
limited to at least $255,000 in U.S. Currency and all that lot or
parcel of land, together with its buildings, appurtenances,
improvements, fixtures, attachments and easements, located at 905
Old Mill Road, Franklin Lakes, New Jersey.

### Substitute Asset Provision

55.  If any of the above-described forfeitable property, as
a result of any act or omission of the defendant:  (a) cannot be
located upon the exercise of due diligence;  (b) has been
transferred or sold to, or deposited with, a third person;  (c)
has been placed beyond the jurisdiction of the Court;  (d) has
been substantially diminished in value;  or (e) has been
commingled with other property which cannot be subdivided without
difficulty, it is the intent of the United States, pursuant to 21
U.S.C. § 853(p), to seek forfeiture of any other property of said
defendant up to the value of the above forfeitable property,

34

including but not limited to the following: all that lot or
parcel of land, together with its buildings, appurtenances,
improvements, fixtures, attachments and easements, located at 905
Old Mill Road, Franklin Lakes, New Jersey.

(Title 18, United States Code, Section 981 and
Title 28, United States Code, Section 2461)


GRAND JURY FOREPERSON

LEV L. DASSIN
Acting United States Attorney


35

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### BERNARD B. KERIK,

**Defendant.**

## INDICTMENT

08 Cr. 1027 (SCR)

**(In Violation of Title 18, United States Code, Section 1349; Title 18, United States Code, Section 1341; Title 18, United States Code, Section 1343; Title 18, United States Code, Section 1001; Title 18, United States Code, Section 1014; Title 26, United States Code, Section 7212(a); Title 26, United States Code, Section 7206(1); Title 26, United States Code, Section 7206(2).)**

LEV L. DASSIN
Acting United States Attorney.

**A TRUE BILL**

Foreperson.